UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LAURA A. LANGDON, | ) | Civil No. 12-CV-2624 AJB (NLS) |
| Plaintiff, | ) | |
| | ) | **REPORT AND** |
| v. | ) | **RECOMMENDATION FOR** |
| | ) | **ORDER GRANTING** |
| | ) | **PLAINTIFF'S MOTION FOR** |
| MICHAEL J. ASTRUE, Commissioner | ) | **SUMMARY JUDGMENT AND** |
| of Social Security, | ) | **DENYING DEFENDANT'S** |
| | ) | **CROSS MOTION FOR** |
| Defendant | ) | **SUMMARY JUDGMENT** |
| | ) | |
| | ) | (Dkt. Nos. 13 and 15.) |
| | ) | |

Laura A. Langdon ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant") denying her claim for disability insurance benefits. (Dkt. No. 1.) This case was referred for a Report and Recommendation on the parties' cross-motions for summary judgment. *See* 28 U.S.C. § 636(b)(1)(B); (Dkt. No. 4.) After careful consideration of the moving papers, the administrative record, and the applicable law, the Court **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED** and that Defendant's cross-motion for summary judgment be **DENIED**.

/ / /

# I.    BACKGROUND

## A.    Evaluation of a Disability Under the Social Security Act

To qualify for disability benefits under the Social Security Act ("SSA"), an applicant must show an inability to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or is expected to last at least twelve months. 42 U.S.C. § 423(d). The Social Security Regulations establish a five-step sequential evaluation process to decide whether an applicant is disabled under the SSA. 20 C.F.R. § 404.1520(a); *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011).

The first step is to determine whether the applicant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the applicant is not, then it must be ascertained whether the applicant is suffering from a severe impairment, or a combination of impairments that is severe, within the meaning of the Social Security regulations. 20 C.F.R. § 404.1520(a)(4)(ii). If the impairment or combination of impairments is severe, the third step is to find out whether the impairment or combination of impairments meets or equals one of the "Listing of Impairments" in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the applicant's impairment or combination of impairments does meet or equal a Listing, the applicant must be found disabled. *Id.* If the impairment or combination of impairments does not meet or equal a listing, the fourth step is to ascertain whether the applicant retains the residual functional capacity ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the applicant cannot perform past relevant work, the fifth step is to determine whether the applicant can perform any other work that exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

In addition, the SSA provides a special procedure for evaluating a disability claim based on a mental illness. 20 C.F.R. § 404.1520a. Those reviewing an application must follow a "special psychiatric review technique" that assesses the degree of the applicant's functional limitation in four work-related areas. *Id.*; *Keyser*, 648 F.3d at 725. The areas

include "activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). The degree of limitation in the first three areas are rated using a five point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The degree of limitation in the fourth area, episodes of decompensation, is rated by: none, one or two, three, four or more. *Id.* The Administrative Law Judge ("ALJ") is required to incorporate pertinent findings and conclusions based on the psychiatric review technique into his or her decision and "must include specific findings as to the degree of limitation in each of the functional areas." *Keyser*, 648 F.3d at 725.

Current SSA regulations describe nine categories of mental impairment. 20 C.F.R. § 404, subpt. P, app.1 § 12.00. Each Listing consists of a statement describing the disorder, a list of criteria that must exist to substantiate the presence of the particular disorder (paragraph "A" criteria), and a list of criteria that describes impairment-related functional limitations that are "incompatible with the ability to do any gainful activity" (paragraph "B" criteria). *Id.* A claimant's mental disorder must satisfy both paragraph "A" and "B" criteria to meet or equal one of the Listings. *Id.* To satisfy the paragraph "B" criteria, the claimant's mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties maintaining concentration, persistence, or pace; or repeated episodes of deterioration or decompensation. *Id.* Additional criteria that describe impairment-related limitations (paragraph "C" criteria) are utilized for certain mental disorders if the paragraph "B" criteria are not satisfied. *Id.*

While the applicant carries the burden of proving eligibility for benefits at steps one through four of the five-step sequential evaluation process, the burden at step five rests with the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003). Applicants not disqualified at step five are eligible for disability benefits. *Id.* In making the determination, "the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443

(9th Cir. 1983); *Widmark v. Barnhart*, 454 F.3d 1063, 1068 (9th Cir. 2006).

**B.    Procedural History**

Plaintiff filed an application for Social Security disability benefits on January 23, 2009.  Administrative Record ("AR") 28.  She alleges her condition rendered her unable to work on January 5, 2008.  *Id.*  The application was initially denied on May 1, 2009, and her request for reconsideration was denied on September 22, 2009.  *Id.*  Plaintiff filed a written request for a hearing on November 12, 2009 and the hearing was scheduled for November 17, 2010.  *Id.*  The hearing was bifurcated and testimony was taken from Plaintiff, a vocational expert, and an internist.  *Id.*  The hearing was continued for the court to subpoena missing medical records and for Plaintiff to attend a psychiatric consultative examination.  *Id.*  A second hearing took place on March 3, 2011.  *Id.*  In addition to Plaintiff, a medical expert and a vocational expert testified.  *Id.*  Based on the testimony and the documentary evidence, the ALJ issued a decision denying Plaintiff's request for benefits.  AR 28-39.  Plaintiff then filed a request for review of the decision.  AR 22.  The Appeals Council denied the request for review, and the ALJ's decision became the final decision of the Commissioner.  AR 1-4; *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 n.1 (9th Cir. 2004).

Plaintiff filed this complaint for judicial review of Defendant's final decision. (Dkt. No. 1.)  She argues that the ALJ failed to give specific and legitimate reasons for rejecting the opinion of her treating psychologist.  (Dkt. No. 13-1 at 8.)  She asks that this Court reverse the Commissioner's decision, credit the treating psychologist's opinion, and remand for further proceedings.  *Id.*

**C.    Documentary Evidence**

**1.    Diabetes and Endocrine Associates (2007 - Present)**

Plaintiff was diagnosed with Type 1 diabetes when she was two years old.  AR 443.  She became a patient at Diabetes and Endocrine Associates in 2007, when she transitioned from pediatric to adult care.  AR 487.  Plaintiff is primarily under the care of Dr. Raymond Fink, M.D., and Andrea Gaspar, PA-C, and uses an insulin infusion pump,

finger stick testing, and an injectable hormone to control her disease.  AR 451.  In June 2009, Ms. Gaspar submitted a letter to the Department of Social Services in support of Plaintiff's disability application.  AR 443.  She noted that despite Plaintiff's best efforts, she has been unable to adequately care for own disease as an adult and she has had four severe hypoglycemic reactions requiring hospitalization since September 2007.  *Id.*  Ms. Gaspar opined that Plaintiff's mental illness limits her ability to focus and stay motivated and that she is unable to work full-time and manage her diabetes; however she can work part-time or go to school part-time and manage her disease.  *Id.*  Ms. Gaspar stated that Plaintiff is a highly motivated patient but if she were to become uninsured, she would fall into debt and may neglect her care.  *Id.*

### 2.  Dr. Leonard Naiman, M.D., Non-Examining Physician (2009)

Dr. Leonard Naiman completed a physical residual functional capacity assessment of Plaintiff in April 2009.  AR 376.  He concluded that Plaintiff did not have any exertional, postural, manipulative, or visual limitations; however due to past hypoglycemic episodes, Plaintiff should avoid heights and machinery.  AR 377-80.

### 3.  Dr. Satya Tata, M.D., Psychiatric Centers at San Diego, Psychiatrist (August 2008 - Present)

Dr. Sataya Tata, a psychiatrist at the Psychiatric Centers at San Diego, has been treating Plaintiff since August 18, 2008.  AR 360.  During her initial evaluation, Dr. Tata noted that Plaintiff's judgment was mildly impaired and she had fair impulse control.  AR 363-64.  She diagnosed her with Generalized Anxiety Disorder ("GAD") and Major Depressive Disorder ("MDD") and gave her a Global Assessment of Functioning ("GAF") score of 55-65.[1]  *Id.*  Although Dr. Tata estimated that Plaintiff could reach her

---

[1]Psychologists and Psychiatrists use a Global Assessment of Functioning (GAF) to rate an individual's social, occupational, and psychological functioning.  *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 598 n.1 (9th Cir. 1999).  An individual with a GAF score between 41 and 50 demonstrates serious symptoms or serious impairments in social, occupational, or school functioning, such as the inability to keep a job.  *Id.*  A GAF score between 51-60 indicates moderate symptoms, including occasional panic attacks, or moderate difficulties in social, occupational, or school functioning, such as

treatment goals in four to six sessions, AR 365, Plaintiff continues to see Dr. Tata every two to three months for treatment. *See* AR 80, 536.

During her initial appointment, Plaintiff denied having anxiety or depression. AR 360. During subsequent appointments, however, Plaintiff reported symptoms of anxiety related to going to school and finding a job. AR 359, 949. In general, Dr. Tata's progress notes from 2008 through 2010 indicate that Plaintiff was able to control her anxiety symptoms and was doing fairly well, although she was unable to find and keep full-time employment and her mother continued to assist her with daily activities. AR 359, 618-20, 802-03.

In November 2009, Dr. Tata submitted a letter to the Department of Social Services in support of Plaintiff's application for reconsideration. AR 534. Dr. Tata indicated that even with a maximum dose of medication and therapy, Plaintiff had not been able to hold a full-time job and probably would not be able to do so in the future. *Id.* Additionally, she opined that Plaintiff's depression needed to be treated on a consistent basis in order for her to manage her diabetes. *Id.*

In April and October of 2010, Dr. Tata submitted mental impairment questionnaires to Plaintiff's counsel. AR 536, 610. In both she gave Plaintiff a GAF score of 45-55 and indicated that despite adherence to her treatment recommendations, Plaintiff's result was "not optimal." *Id.* Additionally, Dr. Tata noted that due to chronic severe anxiety, Plaintiff was incapable of living independently or having a full-time job. *Id.* She determined that Plaintiff was seriously limited in several mental abilities and aptitudes needed to do unskilled work, including maintaining attention for two-hour segments, maintaining regular attendance and being punctual, completing a normal workday and workweek without interruptions from psychologically based symptoms, and

---

few friends, and conflicts with co-workers. *Tagger v. Astrue*, 536 F.Supp.2d 1170, 1173 n.6 (C.D. Cal. 2008). An individual with a GAF score of 61-70 generally functions well, and has some meaningful interpersonal relationships, although the individual demonstrates mild symptoms, such as depressed mood, or some difficulty in social, occupational, or school functioning. *Id.* at 1173 n.7.

responding appropriately to changes in a routine work setting. AR 538, 612. Additionally, Dr. Tata's opinion was that Plaintiff was unable to meet competitive standards for making simple work-related decisions, performing at a consistent pace without an unreasonable number and length of rest periods, and dealing with normal work stress. *Id.* Finally, Dr. Tata indicated that Plaintiff had marked difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. AR 540, 614.

In 2011 and 2012, Dr. Tata's progress notes indicate that Plaintiff was looking for a job, but was not motivated, that she felt isolated, was sleeping a lot, and was not realistic about supporting herself. Additionally, she was suffering panic attacks and did not wish to continue using a therapist for her treatment. AR 896, 898, 899, 949. Dr. Tata submitted a medical source statement and evaluation form to Plaintiff's counsel in April 2012, indicating that Plaintiff had an extreme restriction interacting appropriately with the public, and a marked restriction interacting appropriately with supervisors and co-workers, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a routine work setting due to her severe anxiety in social situations. AR 926. Further, she stated that Plaintiff's ability to hold a job, manage her diabetes, and manage her finances were severely impaired due to Obsessive Compulsive Disorder ("OCD") and GAD. *Id.* Dr. Tata listed her prognosis of Plaintiff as "poor." AR 931.

### 4. Dr. Lindsey Alper, Ph.D., Psychologist (2005-2010)

On April 11, 2005, Plaintiff was referred to Dr. Lindsey Alper, Ph.D., for individual psychotherapy for OCD, social phobias, and dependent personality disorder.[2] AR 758. She began seeing Dr. Alper once per week, however her frequency of visits were reduced to once every two weeks at some point during her therapy. AR 374. In her

---

[2]The Court notes that the administrative record does not contain Dr. Alper's medical records for 2008.

treatment records for 2009 and 2010, Dr. Alper consistently noted that Plaintiff refused to take responsibility for her life, waited for others to care for her, and expected others to change to accommodate her. AR 709-10, 720, 725, 727, 728, 730. Additionally, Dr. Alper indicated that Plaintiff "gives lip service to what she needs to do, but has no plan, no desire to move out of her comfort zone" and has tantrums when she does not get her way. AR 725-26. In 2009, Plaintiff acknowledged that her anxiety was preventing her from moving toward autonomy. AR 723, 730 Dr. Alper repeatedly recommended that Plaintiff attend group therapy, however Plaintiff did not follow through and admitted that she would not do so unless forced. AR 717, 719, 720, 722.

In March 2009, Dr. Alper submitted a short form evaluation of Plaintiff to the Department of Social Services. AR 375. Consistent with her treatment records, Dr. Alper's responses indicated that Plaintiff had a sense of entitlement and believed others should take care of her. *Id.* Additionally, Dr. Alper noted Plaintiff made very little progress in therapy and was non-compliant with numerous treatment recommendations. AR 373. Dr. Alper opined that Plaintiff's ability to maintain concentration, attention, and persistence, as well as her ability to respond appropriately to changes in a work setting were fair. *Id.* She also noted that Plaintiff's ability to perform activities within a schedule and maintain regular attendance, and her ability to complete a normal workday and workweek without interruption from psychologically based symptoms was poor. *Id.* Finally, she indicated that Plaintiff's judgment was moderately to severely impaired, she had a rigidity in beliefs and perceptions, she was irritable, aggressive, manipulative, and she had poor impulse control. AR 374-75.

In May 2009, Plaintiff informed Dr. Alper that her application for social security benefits was denied and she was trying to appeal. AR 724. Dr. Alper expressed concerns to Plaintiff that she thought going on disability would be counterproductive in enabling Plaintiff to enter into adulthood. *Id.* Ultimately, Dr. Alper agreed to write a report listing Plaintiff's diagnosis and symptoms but she noted she did not feel Plaintiff was totally disabled. *Id.* In August 2009, Dr. Alper responded to a request for a report from the

Department of Social Services and stated that in her opinion, Plaintiff did not have any physical limitations, no memory or compensation defects, but her ability to persevere in tasks is impaired and she demonstrates an inflexibility that results in poor adaptation to demands. AR 517. Additionally, she submitted a note to the Department of Social Services in November of 2009 that stated "despite our work and the addition of medication for anxiety and depression, she has made very little progress." AR 535.

### 5. Dr. D. Williams, M.D., Non-Examining Physician (2009)

Dr. D. Williams completed a psychiatric review technique form and a mental residual functional capacity assessment of Plaintiff in April 2009. AR 384, 395. Dr. Williams indicated that Plaintiff had moderate difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence, and pace. AR 392. Additionally, he noted that Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and she was moderately limited in her ability to interact appropriately with the general public. AR 396.

Dr. Williams noted that while Plaintiff's therapist said she had a sense of entitlement, irritability if others do not care for her needs, and manipulative behavior, "these beliefs about herself do not equate to a disability." AR 394. Further, based on his administrative review, Dr. Williams did not find that Plaintiff was anxious, angry, labile, and only had fair concentration, as her therapist had indicated. *Id.* Dr. Williams opined Plaintiff was not severely impaired, but historically, Plaintiff tolerates stress poorly, therefore unskilled, non-public work is best for her. AR 394.

### 6. Dr. Mounir Soliman, M.D., Seagate Medical Group, Examining Psychiatrist (2010)

At the request of the Department of Social Services, Dr. Mounir Solimon performed a consultative psychological examination of Plaintiff on December 21, 2010. AR 778. During the exam, Dr. Solimon observed Plaintiff was pleasant and cooperative

and he determined she can cook, clean, shop, and take care of her personal hygiene and financial responsibilities. *Id.* Additionally, she gets along with family, friends, and neighbors and can focus on daily activities. AR 780. Dr. Solimon noted that Plaintiff's mood was depressed and she showed neurovegetative signs and symptoms for decreased concentration and energy. AR 781. He diagnosed her with major depression and gave her a GAF score of 66. *Id.*

Dr. Solimon concluded that Plaintiff can understand, carry out, and remember simple and complex instructions and is able to interact with co-workers, supervisors, and the general public. AR 782. He ascertained that she can "withstand the stress and pressures associated with an eight-hour workday, and day-to-day activities." *Id.* While Plaintiff has a history of depression and anxiety, Dr. Solimon stated her symptoms are treatable and manageable as an outpatient. *Id.*

### D.     Hearing Testimony

#### 1.     Plaintiff's Testimony

Plaintiff testified at both hearings in front of the ALJ. *See* AR 48, 73. During the first hearing, Plaintiff stated she began seeing Dr. Tata in 2008 and was continuing to see her every couple of months. AR 48-49. Additionally, she started seeing her therapist, Dr. Alper, in 2005, but she stopped seeing her in June 2010 due to vacation issues. AR 49. The ALJ also reviewed Plaintiff's employment history with her and Plaintiff indicated she was working as a part-time cashier at Target, earning approximately $200-300 per month. AR 55. She stated her only other form of financial support was from food stamps, which she had been receiving since July 2010. AR 58.

At the second hearing, Plaintiff testified she lived with her mother and sister in El Cajon and was currently engaged to be married. AR 73. While she stated she had a few friends, she said she mostly talked to them online or on Facebook and did not see them in person very often. AR 74. She said she did not belong to any social groups and when she was with her boyfriend, they would normally sit around and play on the computer, watch television, or play video games. AR 83. She said she had not taken any college

courses since 2009 because she did not feel she could afford it and she would rather spend time with her boyfriend. *Id.* Plaintiff also indicated that she believed she was emotionally over-dependent on her boyfriend. *Id.*

Plaintiff testified that she was able to shower and take her medication without being reminded. AR 75. She said she did not work full time because it made her anxious and she could not handle the stress of being around other people. *Id.* Although Plaintiff stated she never had a full-time job, she said she did not think she would be able to make it through an eight-hour shift due to the stressors and availability of being there all day long. *Id.* Additionally, she said she calls out a lot from her current job because she is depressed, anxious, or would rather be at home with her boyfriend or mother. AR 74-75.

Plaintiff stated she began receiving mental health treatment at the San Diego Psychiatric Centers in 2004 or 2005 because she was depressed and having "bad thoughts of OCD, suicide." AR 78. She said she was taking Cymbalta for depression and Buspar for anxiety and that the medication was helping with her symptoms of anxiety and depression, but not as much as she wanted it to. AR 76. She stated she had anxiety attacks at work and dealing with the public made her flustered. AR 77. In addition to her psychiatrist, Plaintiff testified she also saw a psychologist from June 2008 through 2010. She said she normally would not do what her psychologist recommended, but she told her everything was okay because Plaintiff did not want to be in trouble. AR 81.

### 2. Medical Expert Testimony

#### a. Dr. John Morse, M.D.

Dr. John Morse testified as an impartial medical expert ("ME") at the first hearing held on November 17, 2010. AR 59. He concluded that Plaintiff's primary impairment was Type I, insulin dependant diabetes mellitus. AR 60. Although it does not meet or equal any Social Security Disability Listings, Dr. Morse stated her disease does impose limitations on Plaintiff's ability to work. AR 61. Due to her history of hypoglycemic issues, Dr. Morse indicated that Plaintiff should avoid exposure to hazardous machinery and heights. AR 61-62.

### b. Dr. Miriam Sherman, M.D.

Dr. Miriam Sherman testified as an ME at the second hearing held on March 3, 2010. AR 84. After reviewing Plaintiff's medical history, listening to her testimony, and questioning her during the hearing, Dr. Sherman concluded that Plaintiff had a major depressive disorder, a generalized anxiety disorder, and a personality disorder not otherwise specified ("NOS"). AR 88. Dr. Sherman noted that the mental impairment questionnaires filled out by Plaintiff's treating psychiatrist, Dr. Tata, were discordant with Dr. Tata's own narrative about Plaintiff's condition. AR 90. Additionally, Dr. Sherman stated that Plaintiff's treating psychologist, Dr. Alper, felt going on disability would be counterproductive for Plaintiff. *Id.* Dr. Sherman concluded Plaintiff had a mild restriction of activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration with no episodes of decompensation. AR 91. Although she identified a severity of impairment that did not meet any Social Security Listings, Dr. Sherman opined that as a result of Plaintiff's combined condition, Plaintiff was limited to performing non-public simple repetitive tasks. *Id.*

### 3. Vocational Expert Testimony

### a. Katie Macy Powers

Katie Macy Powers testified as a vocational expert ("VE") at the first hearing held on November 17, 2010. AR 63. She testified that Plaintiff was not eligible for entry into skilled work and did not have any past relevant work. AR 65. Therefore, she concluded that Plaintiff had no transferrable skills. *Id.*

### b. Nelly Katsell

Nelly Katsell testified as a VE at the second hearing on March 3, 2011. AR 93. She adopted Ms. Powers's relevant work analysis from the prior hearing as her own. AR 94-95. In response to a hypothetical posed by the ALJ, Ms. Katsell stated that even if Plaintiff was required to avoid concentrated exposure to hazards and was limited to non-public simple repetitive tasks, a significant number of jobs remained in the occupational

12-CV-2624 AJB (NLS)

base.  AR 96.  She provided three examples of available jobs, including an eye-dropper assembler, a garment folder, and a hand packager.  AR 97.  Plaintiff's attorney posed a second hypothetical and asked Ms. Katsell if Plaintiff would be precluded from all competitive work if she had a difficulty maintaining concentration, persistence and pace that seriously interfered with her ability to function appropriately, effectively, and on a sustained basis.  AR 98.  Ms. Katsell responded that it would.  *Id.*

### E.    ALJ's Written Decision

The ALJ issued a written decision on March 25, 2011.  AR 28-39.  He found that Plaintiff met the insured status requirements, and that she had not engaged in substantial gainful activity since the alleged onset date of her disability, January 5, 2008.  AR 30. The ALJ also found that Plaintiff had the following severe impairments: diabetes mellitus, type I; major depressive disorder, generalized anxiety disorder, and personality disorder NOS.  *Id.*  The ALJ concluded that none of Plaintiff's impairments or combination of impairments met or equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  AR 31.  In drawing this conclusion, the ALJ considered the expert testimony of Dr. Sherman and ascertained that Plaintiff's restrictions of daily activities were mild; her difficulties of maintaining social functioning were moderate; her difficulties of maintaining concentration, persistence, or pace were moderate; and she did not have any episodes of decompensation, which were of extended duration.  AR 32. Because her mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, the ALJ determined the paragraph "B" criteria were not satisfied.  *Id.*  Additionally, the ALJ determined the evidence failed to establish the presence of paragraph "C" criteria.  *Id.*

The ALJ also found that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels; however she should avoid even moderate exposure to hazards, machinery, and heights, and is limited to non-public simple repetitive tasks.  *Id.*  In making this determination, the ALJ analyzed whether there was "an underlying medically determinable physical or mental impairment" and whether that

impairment "could reasonably be expected to produce [Plaintiff's] pain or other symptoms. AR 33. He then evaluated "the intensity, persistence, and limiting effect of [Plaintiff's] symptoms to determine the extent to which they limit [Plaintiff's] functioning." *Id.* The ALJ concluded that Plaintiff's allegations of disabling symptoms and limitations were not credible to the extent that they would prevent activity requiring non-public simple repetitive tasks. AR 37.

The ALJ rejected Plaintiff's allegations of disabling symptoms and limitations for two reasons. AR 36. First, Plaintiff did not follow treatment or take medications as prescribed. *Id.* The ALJ opined that Dr. Alper reported Plaintiff made very limited progress in therapy, which indicated she had been non-compliant with treatment recommendations. *Id.* Additionally, the ALJ noted that Plaintiff testified she normally did not do what Dr. Alper recommended, and told people she was okay when she was not because she did not want to get in trouble. *Id.* Second, in his consultative examination of Plaintiff, Dr. Soliman determined Plaintiff could cook, clean, shop, run errands, take care of her personal hygiene and financial responsibilities, drive a car, and focus on daily activities. AR 36-37. Additionally, Dr. Soliman indicated that Plaintiff got along with family, friends and neighbors. *Id.*

During the hearing, Plaintiff's counsel argued that Plaintiff would be unable to perform any work if she had difficulty maintaining concentration, persistence, or pace at a level and degree as to seriously interfere with her ability to function appropriately, effectively, and on a sustained basis. AR 37. In his decision, the ALJ determined he would not give controlling weight to the opinions of Dr. Tata or Dr. Alper as treating sources. *Id.* The ALJ noted that neither Dr. Tata's nor Dr. Alper's opinions were supported by objective evidence in the record and were inconsistent with other substantial evidence of record. *Id.* He noted that Dr. Alper reported Plaintiff's concentration was intact, her memory was normal, and she had no significant impairment in concentration. *Id.* Additionally, Dr. Tata's conclusion that Plaintiff had been unable to hold a full-time job despite a maximum dose of medication and therapy was "not supported by the totality

of the medical evidence of record, as well as her own progress notes." *Id.*

The ALJ also concluded that Plaintiff had no past relevant work, was a younger individual (defined as one aged 18-49), and had a high school education and could communicate in English. *Id.* Transferability of job skills was not an issue because Plaintiff did not have past relevant work. *Id.* Based on her age, education, work experience, and residual functional capacity, the ALJ determined that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." AR 38. Examples of such jobs were provided by the vocational expert and included an eyedropper assembler, a garment folder, and a hand packager. *Id.* Accordingly, the ALJ found Plaintiff was not eligible for disability insurance benefits. AR 39.

## II.    ANALYSIS

### A.    Standard of Review Regarding Substantial Evidence

An unsuccessful applicant for social security disability benefits is permitted to seek judicial review of a final agency decision. 42 U.S.C. § 405(g). A reviewing court must affirm the agency's decision if it is supported by substantial evidence and applies the correct legal standards. *Id.; Batson*, 359 F.3d at 1193. Substantial evidence means "more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) *citing Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the evidence can support either affirming or reversing the agency's decision, the court may not substitute its own judgment for that of the agency. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). Further, if medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are the exclusive functions of the agency. *Magallanes*, 881 F.2d at 751 (quotations omitted).

Where, as here, the Appeals Council denies a request for review, the ALJ's decision becomes the final agency decision reviewed by the court. *Batson*, 359 F.3d at 1193 n.1.

**B.    Assertion of Error**

In challenging the agency's denial of benefits, Plaintiff argues the ALJ did not provide good reasons for rejecting her treating psychologist's opinion that she exhibits limitations in adapting to full-time work. (Dkt. No. 13-1 at 10.) Plaintiff notes that in his summary of relevant evidence, the ALJ included a statement from Dr. Alper indicating that Plaintiff demonstrates an inflexibility resulting in poor adaptation to demands. *Id.* at 8. While the ALJ stated that Dr. Alper found concentration and memory intact and normal before determining he would not give her opinion controlling weight, Plaintiff argues that intact memory and concentration do not implicate Plaintiff's ability to adapt to the demands of substantial gainful activity. *Id.* at 9. Further, although the ALJ found that Dr. Tata's findings were not supported by the totality of the medical evidence, including her own progress notes, those reasons do not apply to the opinions of Dr. Alper. *Id.* Plaintiff contends that the ALJ did not give any reasons for rejecting Dr. Alper's view that Plaintiff is limited in her ability to adapt to substantial gainful activity. *Id.* at 10. Additionally, Plaintiff argues that Dr. Alper's opinions that Plaintiff has a poor capacity for maintaining a schedule or completing a normal workday or workweek and a moderate to severe impairment in judgment were not rejected, included, or synthesized into the RFC articulated by the ALJ. (Dkt. No. 17 at 5.) Since the ability to adjust to other work is the focus of the five-step inquiry, Plaintiff argues the court should reverse and remand for consideration of Plaintiff's limitation to adapt to full-time work, as described by Dr. Alper. (Dkt. No. 13-1 at 10.)

Neither of the parties dispute the ALJ's findings at steps one, two, three, and five.

**1.    Step Four Analysis**

The RFC is an assessment of the claimant's maximum remaining ability to perform "sustained work activities in an ordinary work setting on a regular and continuing basis," despite the claimant's medically determinable impairments. SSR 96-8p, 1996 WL 374184 (July 2, 1996). In determining a claimant's RFC, the agency must consider all relevant evidence in the record, including factors that may have a significant impact on

the claimant's ability to work. *Robbins*, 466 F.3d at 883; *Erickson v. Shalala*, 9 F.3d 813, 817 (9th Cir. 1993) *citing Varney v. Sec'y of Health and Human Serv.*, 846 F.2d 581, 585 (9th Cir. 1988). While the agency does not need to discuss every piece of evidence in its written decision, the agency is required to explain why significant probative evidence was rejected. *Vincent on behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984); *see also Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003). Additionally, if there are conflicting medical opinions as to the claimant's RFC, the agency may choose which opinion to credit and which to reject. SSR 96-8p. The agency is required, however, to provide an explanation of its determination. *Id.*; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The explanation must be "sufficiently specific" and make clear the reasons for the weight given to the treating source's medical opinion. SSR 96-2p, 1996 WL 374188 (July 2, 1996).

SSA regulations stipulate that the opinion of a treating physician on the nature and severity of the claimant's impairments be given controlling weight if the opinion is well supported by "medically acceptable clinical and laboratory diagnostic techniques" and is consistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). While a treating physician's opinion about the claimant's physical condition or the existence of a disability is not conclusive, the agency must provide clear and convincing reasons for rejecting the treating physician's opinion if it is not contradicted by another doctor. *Magallanes*, 799 F.2d at 751; *see also Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Even if the treating physician's opinion does conflict with that of another doctor, the agency must still provide "specific and legitimate" reasons supported by substantial evidence in the record for rejecting that opinion. *Lester*, 81 F.3d at 830 *citing Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). To meet this burden, the ALJ must do more than offer his or her conclusions; the ALJ must "provide detailed, reasoned, and legitimate rationales for disregarding the physician's findings." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988). Merely listing objective factors and stating that medical opinions are not supported by sufficient objective findings is not

enough. *Id.; see also Salvador v. Sullivan*, 917 F.2d 13, 15 (9th Cir. 1990) (summarizing the doctor's opinion without making any specific reference as to why it was disregarded is not sufficient).

As part of his determination of Plaintiff's RFC at step four of the sequential evaluation process, the ALJ provided a detailed summary of Plaintiff's own testimony and the medical records provided by her treating physicians. AR 32-35. Specifically, the ALJ noted that Plaintiff's treating psychologist, Dr. Alper reported that Plaintiff demonstrated an inflexibility that resulted in poor adaptation to demands. AR 34-35. Additionally, Dr. Alper indicated that Plaintiff's ability to perform activities within a schedule and maintain regular attendance, and her ability to complete a normal workday or workweek were poor. *Id.* The ALJ then summarized the findings of the State's medical consultants before rejecting Plaintiff's own allegations about the severity of her disabling symptoms and limitations. AR 36. The ALJ provided two specific reasons for rejecting Plaintiff's allegations; (1) Plaintiff did not follow treatment or take medications as prescribed by Dr. Alper; and (2) in his consultative examination of Plaintiff, Dr. Soliman reported claimant could cook, clean, shop, run errands, take care of her personal hygiene and financial responsibilities, drive a car, get along with family and friends, and focus on daily activities. AR 36-37.

During the second hearing, Plaintiff's counsel hypothesized that Plaintiff would be unable to work if it were determined that she had difficulty maintaining concentration, persistence, or pace at a level that would seriously interfere with her ability to function appropriately, effectively, and on a sustained basis. AR 37. Plaintiff's counsel supported his allegation by pointing to several exhibits containing the medical opinions of both Dr. Alper and Dr. Tata. *Id.* The ALJ reviewed the specified exhibits and stated they demonstrated Dr. Alper's opinion that Plaintiff's concentration was intact, her memory was normal, and she had no significant impairment in concentration. *Id.* Further, the exhibits included Dr. Tata's report that even with a maximum dose of medication and therapy, Plaintiff had been unable to hold a full-time job. *Id.* The ALJ proceeded to

reason that Dr. Tata's conclusions were not supported by the totality of the medical evidence of record, or her own progress notes, before stating he found no reason to give controlling weight to the opinions of *either* Dr. Tata or Dr. Alper as treating sources. *Id.*

While the ALJ specifically pointed to inconsistencies in Dr. Tata's own progress notes before concluding her opinion would not receive controlling weight, he did not do the same for Dr. Alper. *Id.* Rather, he merely concluded that Dr. Alper's opinions were not supported by objective evidence and were not consistent with other substantial evidence of record without providing "detailed, reasoned or legitimate rationales" for his conclusion.[3] Further, while the ALJ listed a number of Dr. Alper's opinions about Plaintiff's disabling symptoms and limitations in his summary of the record, it appears he only addressed Dr. Alper's view about Plaintiff's concentration and memory. The ALJ did not evaluate Dr. Alper's conclusions about Plaintiff's ability to adapt to demands, or to maintain a schedule and complete a normal workday or workweek. Without an explanation, this Court cannot tell if the ALJ rejected or simply ignored that evidence. While it appears the ALJ relied on the opinion of the State's medical consultant, Dr. Soliman, over Dr. Alper in making his conclusion that Plaintiff is capable of performing unskilled, non-public work, he did not explicitly reject Dr. Alper's opinions or give "specific and legitimate reasons" for crediting Dr. Soliman over Dr. Alper. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996) (failing to provide specific, legitimate reasons for discounting opinion of claimant's examining physician in favor of non-examining medical advisor was error); *Smolen v. Chater*, 80 F.3d 1273, 1286 (9th Cir. 1996) (failing to offer reasons for disregarding opinions of two of claimant's treating physicians and making contrary findings was error). Although legitimate reasons for the ALJ's reliance on Dr. Soliman's opinions over those of Dr. Alper may exist, this Court is only permitted to review the explanation offered by the ALJ in his written opinion. *See*

_____

[3]Merely listing objective factors and stating that a medical opinion is not supported by objective findings does not meet the level of specificity required by case law. *Embrey*, 849 F.2d at 421-22.

*Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).  If the ALJ's explanation is inadequate, the reviewing court may not search the record for reasons that support his decision.  *Id.*

### 2.     Crediting Opinion of Treating Psychologist

Plaintiff argues that because the ALJ did not provide "good reasons" for rejecting Dr. Alper's opinion, this Court should credit her opinion as a matter of law.[4]  To determine whether evidence should be credited as a matter of law, the court must evaluate whether: (1) the ALJ provided legally sufficient reasons for rejecting the evidence; (2) there are outstanding issues to be resolved before a disability determination can be made; and (3) it is clear from the record that if the evidence were credited, the ALJ would be required to find the claimant disabled.  *Harmen v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) *citing Smolen*, 80 F.3d at 1292.  Here, the ALJ failed to provide any reasons for disregarding the opinion of Dr. Alper.  He merely referenced her findings that Plaintiff demonstrated an inflexibility that resulted in poor adaptation to demands, and that her ability to perform activities within a schedule and maintain regular attendance, and her ability to complete a normal workday or workweek were poor.  AR 34-35.  Providing a summary of a medical opinion, without making specific reference to why it was disregarded, is not a sufficient statement of reasons.  *Salvador*, 917 F.2d at 15.  This evidence requires interpretation and analysis.[5]  Once the ALJ has done so, a reviewing court can determine whether he gave the evidence its proper effect.

## III.     CONCLUSION

A reviewing court has discretion to remand a case for further proceedings if

---

[4]Plaintiff cites *Vasquez v. Astrue*, 572 F.3d 586, 594 (9th Cir. 2009) in support of her argument; however in *Vasquez*, the court did not address the application of the "credit as true" doctrine in situations where outstanding issues must be resolved before a disability determination can be made.  *Id.*

[5]Restrictions on a claimant's ability to adapt to changes in a routine work setting have the potential to affect the claimant's RFC and therefore her ability to work.  SSR 96-8p.  Further, the determination of a claimant's mental RFC is "crucial to the evaluation" of her capacity to perform substantial gainful activity when her impairment does not meet or equal a listing, but is nonetheless severe. 20 C.F.R. § 404, subpt. P, app.1 § 12.00.

12-CV-2624 AJB (NLS)

additional proceedings would remedy the defects in the ALJ's decision. *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990).

Based on a review of the record and consideration of the briefs submitted, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **GRANTED** and Defendant's Cross-Motion for Summary Judgment be **DENIED**. This Court **RECOMMENDS** that the final decision of the Commissioner be **REVERSED** and **REMANDED** to the Social Security Administration for proper evaluation of Dr. Alper's opinion and its effect on Plaintiff's claim for disability, and other further action that is deemed appropriate and consistent with this Report and Recommendation.[6]

The undersigned submits this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) to the United States District Judge assigned to this case.

**IT IS ORDERED** that no later than <u>**July 31, 2013**</u>, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than <u>**August 7, 2013.**</u> The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED:  July 9, 2013

Hon. Nita L. Stormes
U.S. Magistrate Judge
United States District Court

---

[6]The ALJ is also encouraged to develop the record further by obtaining Dr. Alper's treatment records from 2008.

21

12-CV-2624 AJB (NLS)